47 CCPA
**Application of Donald Wallace ADAMSON and Walter Mark Duffin.**

**Patent Appeal No. 6519.**

United States Court of Customs
and Patent Appeals.

March 15, 1960.

1. United States District Judge for the Eastern District of Pennsylvania, designated to participate *in place of Judge*

Rockwell & Bartholow, New Haven, Conn. (James M. Mason, New Haven, Conn., of counsel), for appellants.

Clarence W. Moore, Washington, D. C., Jack E. Armore, Washington, D. C. (Joseph Schimmel, Washington, D. C., of counsel), for Comr. of Patents.

Before WORLEY, Chief Judge, RICH, MARTIN, and SMITH, Judges, and Judge FRANCIS L. VAN DUSEN.[1]

MARTIN, Judge.

This appeal is from a decision of the Board of Appeals affirming the final rejection of claims 1 to 11, inclusive, the only claims remaining in application Serial No. 415,412, filed March 10, 1954, entitled "Therapeutic Isomers and Method of Making."

Claim 1 is a typical claim.

"1. A *laevo*-isomer of a compound selected from the class consisting of 1-*cyclo*hexyl-1-phenyl-3-piperidinopropan-1-ol and 1-*cyclo*hexyl-1-phenyl-3-pyrrolidinopropan-1-ol and their acid addition salts and quaternary ammonium salts substantially separated from the *dextro*-isomer."

As is apparent from the quoted claim the invention is directed to the laevo-isomers, and the acid addition salts and

*O'Connell*, pursuant to provisions of Section 292(d), Title 28 U.S.C.

quaternary ammonium salts thereof, of two particular compounds. Appellants have found that the laevo-isomers have substantially higher spasmolytic activity than either the dextro-isomer or the racemic mixture as well as having only slightly higher toxicity than the same quantity of the racemate.[2]

Process claim 10 recites the steps of "separating racemic mixtures" of the compounds named in claim 1, and "recovering the *laevo*-isomer * * * substantially free of the *dextro*-isomer." To this, process claim 11 adds the step of quaternizing the laevo-isomers to form quaternary ammonium salts. Appellants' preferred method of isolating those isomers is concededly old in the stereo-isomer art.

The references of record are:

Adamson et al., 2,682,543, June 29, 1954; Adamson et al., Journal of the Chemical Society of London, p. 52 (1951); Karrer, Organic Chemistry, 2nd Ed., pp. 92–102 (1946).

The Adamson references disclose synthetically produced compounds of the *same* formula claimed. However, neither states that the compounds are either racemic mixtures or that dextro- and laevo-isomers exist. Those compounds have valuable physiological properties, including spasmolytic activity, and are especially useful in the treatment of Parkinson's disease.

The fundamentals of optical activity and stereo-isomerism are presented in a section of an organic chemistry text written by Karrer. Principally relied upon by the Patent Office are the teachings therein that optical activity is attributable to asymmetric molecular structure and that synthetically produced substances containing asymmetric carbon atoms are optically inactive due to the formation of equal amounts of the dextro- and laevo-isomers. Such compounds are said to be racemic. Karrer teaches that racemates may be resolved (separated) by various methods including the one utilized by appellants to separate their specific laevo-isomers.

The treatise indicates that, except for their effect upon polarized light, their physiological behavior and their relative reactivity with other optical isomers, "in the case of innumerable *d*- and *l*-forms, the chemical and physical properties of * * * [those isomers] have always proved to be identical." This is so, even though the chemical and physical properties of a racemate may be substantially different than those of its stereo-isomers. It further states that "the physiological properties of two antipodes [stereo-isomers] can differ con-

**2.** An affidavit by White submitted on appellants' behalf compares the spasmolytic activity and toxicity of a quaternary ammonium salt (methiodide) and an acid addition salt (hydrochloride) of the laevo-isomer of 1-cyclohexyl-1-phenyl-3-prrolidinopropan-1-ol to the dextro-isomer, the racemate and atropine sulfate. The spasmolytic activities were calculated from the relaxation caused by varying concentrations of the drug after an induced spasm. The relative toxicities were ascertained by determining the quantities of the drugs necessary to cause mortality.

| Compound | Guinea Pig Ileum | | Rabbit Ileum | |
| --- | --- | --- | --- | --- |
| | Methiodide | Hydrochloride | Methiodide | Hydrochloride |
| | Spasmolytic Activity | | | |
| Dextro-isomer | 0.01 | 0.002 | 0.006 | 0.0015 |
| Laevo-isomer | 1.6 | 0.10 | 2.0 | 0.15 |
| Racemate | 0.7 | 0.05 | — | 0.08 |
| Atropine Sulfate | 1.0 | — | 1.0 | — |

| Compound | Toxicity (LD 50, mg./kg.) | |
| --- | --- | --- |
| | Methiodide | Hydrochloride |
| Dextro-isomer | 9 | 69 |
| Laevo-isomer | 14 | 86 |
| Racemate | 13 | 79 |

siderably," giving as examples several pairs of optical isomers which differ substantially in their physiological effects. "The cause of the different physiological behavior," it is said, "lies in the fact that many constituents of cells within the organism with which the substances react are themselves asymmetric."

All of the claims have been rejected as unpatentable over either Adamson reference in view of Karrer. While admitting that no mention, either directly or by implication, of optical isomerism is made in the Adamson publications, the board held that the Karrer reference would lead one skilled in the art to believe that the Adamson compounds existed in racemic form and thus were potentially separable into their optically isomeric forms. For these reasons it was held that both the compounds and the broad method claims would have been obvious to one of ordinary skill in the art. The White affidavit showing the substantially greater spasmolytic activity, in conjunction with only a small increase in toxicity, of the laevo-isomer over those of the dextro-isomer and racemate was not considered persuasive by the board. Finally, the board ruled that In re Williams, 171 F.2d 319, 320, 36 CCPA 756, was not controlling in appellants' favor.

Appellants contend that their invention lies in the discoveries that the racemate of the Adamson references can be separated, that the optical isomers exist, and that the laevo-isomer exhibits surprisingly superior spasmolytic activity, surprising because the prior art, it is alleged, would suggest that the dextro- and laevo-isomers would have substantially the same therapeutic activities. The Karrer reference, it is said, deals with compounds so different from those at bar, that any inferences drawn with respect to the compounds therein discussed are inapplicable here. Finally appellants rely heavily upon the Williams case, which case, it is argued, requires a judgment in their favor.

It is our opinion that the claimed compounds are unpatentable over either of the cited Adamson references in view of Karrer. Appellants do not dispute the facts that racemic mixtures of their isomers and acid addition salts are structurally disclosed in the primary references, that they are the product of organic syntheses, and that they have asymmetric carbon atoms. Karrer states that synthetically produced organic compounds containing an asymmetric carbon atom are racemic, i. e., optically inactive mixtures of equal amounts of the dextro- and laevo-isomers. In view of the teachings of Karrer we feel that one of ordinary skill in the stereoisomer and pharmaceutical arts would recognize that the Adamson compounds exist as racemates, hence the fact that no reference to stereoisomerism is made by the Adamson references themselves is of no moment.

It is at this point that In re Williams, supra, is distinguishable. In that case the court held a laevo-isomer to be patentable over a reference showing the compound's formula. In so doing the court said it found nothing in the record on appeal to indicate that one skilled in the art "should have known that the Monatschefte [prior art] product was racemic" and concluded that it would have been improper to "presume such knowledge." The deficiency existing in the Williams record has been satisfied in the case at bar in the form of Karrer which clearly shows that one of ordinary skill in the art *should* have known that the Adamson compounds were racemic.

Neither it is open to dispute that it is well known to those skilled in the art that racemic mixtures are potentially separable, for Karrer teaches that racemates may be resolved into their laevo- and dextro-isomers by one of several methods including the specific method utilized, though not claimed, by appellants.

It is certainly true that Karrer does not state that 1-cyclohexyl-1-phenyl-3-piperidinopropan-1-ol, for example, may be separated and its laevo-isomer iso-

lated, but to suggest that the rejection is deficient for such a reason would mean that a rejection would be proper only if the specific laevo-isomer claimed were somewhere named. It is our opinion that the Karrer teachings would suggest to one skilled in the art that the racemates of the Adamson references may be resolved into their laevo- and dextro-isomers, and appellants in following the teachings of the cited prior art have done no more than the obvious. It has not been argued that the claims drawn to quaternary ammonium salts of the isomers are patentable over the isomers and acid addition salts suggested by the combination of references. In view of that we will assume them to be unpatentable equivalents. The board's rejection of claims 1 to 9 is affirmed.

The only other arguments submitted by appellants all relate to the laevo-isomer's superior spasmolytic activity, and are based primarily upon the showing of the White affidavit summarized earlier in this opinion. That affidavit shows the laevo-isomer to be about twice as active as the racemate, and the dextro-isomer to be virtually inactive, as antispasmodics. Karrer teaches that the pharmacological activity of two stereoisomers may differ substantially because of the nature of the substances with which they react to produce their physiological effects. Appellants argue that the compounds from which Karrer deduces that general principle are so different from their own laevo-isomers that the general rule is inapplicable here.

Concededly those compounds are different. However, we find no reason of record to believe that Karrer's statement would not teach one of ordinary skill in the art that the optical isomers of the Adamson et al. racemates, and the quaternary ammonium salts and acid addition salts thereof, may have different spasmolytic activities. In establishing that fact experimentally appellants have done no more than is suggested by the prior art and have ascertained no more than what would be expected by one skilled in the art, i. e., the activities are different. The toxicity of the racemate is shown by the affidavit to lie between that of its isomers, which fact appears to us to be particularly expected. We find that the contentions based upon the properties of the claimed compounds are devoid of persuasive force upon the issue of those compounds' obviousness.

Process claim 10 recites only the broad steps of separating the isomers and "recovering the *laevo*-isomer from the [racemic] mixture substantially free of the *dextro*-isomer," claim 11 adding to that the step of quaternizing the laevo-isomer. We believe it to be sufficiently clear from our treatment of the claimed compounds why we also consider the process claims to be obvious. Consequently, we affirm the board's rejection of those claims.

The decision of the Board of Appeals affirming the examiner's final rejection of claims 1 to 11 is affirmed.

Affirmed.